UNITED STATES of America ex rel. J. W. CROWDER et al.

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, W. R. Miller, W. L. Long, and Miller & Long.

Civ. A. No. 4150.

United States District Court
W. D. Louisiana, Lake Charles Division.
Aug. 22, 1956.

Trotter, Morris & Cornish, Houston, Tex., Watson & Williams, Natchitoches, La., for plaintiffs.

Fulbright, Crooker, Freeman & Bates, Houston, Tex., Plauche & Plauche, Lake Charles, La., for defendants.

HUNTER, District Judge.

Plaintiffs brought this action under the provisions of the Miller Act, 40 U.S. C.A. § 270a et seq., in the name of the United States and against the contracting firm of Miller & Long, and Fidelity and Deposit Company of Maryland, the surety on the bond of Miller & Long, to recover for work performed for and equipment supplied to Miller & Long *in connection with the performance of its contract with the United States,* dated September 27, 1951, for the re-location of the Missouri Pacific Railroad Company railroad lines around the Lake Charles Air Force Base.

There is no question here of loss of anticipated profits. Both the subcontractor and the contractor last money. Plain-

tiffs argue that Miller & Long either wrongfully terminated the subcontract or else the subcontract was terminated by mutual agreement. In brief, they itemize their claim as follows:

"(A) Balance due on borrow and channel excavation $14,437.-09.

"(B) $1,500.00 due on trenching.

"(C) Due for use of equipment during 15 days $8,723.00.

"(D) Extra cost of handling dirt by virtue of poor engineering on the part of Miller and Long's Engineers $15,000.00.

"(E) Crowder's share of $46,310.-21 extra payment made by Government on account of additional costs of dirt work

because of delay in starting job, $16,000.00.

"(F) Additional costs of $2,500.00 because of dirt having to be hauled around fences."

Defendants put at issue the material allegations of the complaint, and also filed a counter-claim, wherein it was alleged that the contractor was compelled to terminate the contract because of plaintiffs' refusal to perform it and demanded damages for its breach against plaintiffs. Defendants further say that if the Court should find that the contract was terminated by mutual agreement, that then the evidence, when viewed most favorably to the plaintiffs, would reveal that the following accounting is proper:

| Items Claimed by Plaintiffs | Total Claimed | Proven and Recoverable |
|---|---|---|
| 1. 92,000 cubic yards of borrow, 3,192 yards of channel | $ 59,717.20 | $22,079.00 |
| 2. Trenching | 1,500.00 | 000.00 |
| 3. Equipment rental | 8,723.00 | 5,000.00 |
| 4. Poor engineering | 15,000.00 | 000.00 |
| 5. Delay | 16,000.00 | 000.00 |
| 6. Erection of fences | 2,500.00 | 000.00 |
| Total | $103,440.20 | $27,079.00 |

| Credits Due Defendants by Plaintiffs | |
|---|---|
| 1. Payments made on estimates | $24,480.30 |
| 2. Pay roll advances (stipulation 9) | 17,300.31 |
| 3. Equipment rental (stipulation 10) | 1,835.80 |
| 4. Equipment rental (stipulation 12) | 4,500.00 |
| 5. Equipment rental (stipulation 11) | 1,777.83 |
| 6. Equipment repairs (stipulation 14) | 971.36 |
| 7. Fuel bills (stipulation 13) | 5,226.17 |
| Total | $56,091.79 |

| Balance of Accounts | |
|---|---|
| Credits Due Defendants | $56,091.79 |
| Amount Due Plaintiffs | 27,079.00 |
| Balance Due Defendants | $29,012.79 |

The case was tried to the Court. We have carefully considered the evidence, the respective briefs, authorities cited, and our clear recollection of the trial proceedings. The Court makes the following findings of fact:

(1) Subsequent to the original contract and on or about October 24, 1951, Miller & Long entered into a written subcontract with J. W. Crowder and Associates, plaintiffs, wherein plaintiffs agreed to do all borrow excavation at a price of Fifty (.50) Cents per cubic yard, and all channel excavation at a price of Thirty-Five (.35) Cents per cubic yard.

(2) All the excavation was to be done in strict accordance with the Plans and Specifications furnished by the United States Corps of Engineers.

(3) Subsequent to execution of the subcontract and before work was begun, plaintiffs advised Miller & Long in writing that they were going to cancel the subcontract. However, this never came to pass, and on or about December 15, 1951, plaintiffs commenced work in accordance with the provisions of the original subcontract.

(4) On March 21, 1952, a supplemental contract was entered into between plaintiffs and Miller & Long, increasing from Fifty (.50) Cents per cubic yard to Eighty-Five (.85) Cents per cubic yard the compensation for all borrow excavation in excess of 46,000 cubic yards.

(5) At the beginning of the subcontract, plaintiffs sent their bookkeeper, Mr. Myers, to act as superintendent for their portion of the job, and shortly thereafter Mr. Harp, an equipment operator, took over and continued to act in a supervisory capacity until June of 1952.

(6) In June of 1952 it became apparent that plaintiffs were in financial difficulty and Mr. Crowder personally took charge of the subcontract and informed Miller & Long that plaintiffs were unable to proceed further with the work unless they received financial assistance from someone. Miller & Long offered such financial assistance at the request of the plaintiffs and undertook the financing of plaintiffs' operating expenses, including payrolls, fuel bills, equipment rentals, and equipment repairs. In this capacity they advanced to plaintiffs the sum of *$17,300.31* for plaintiffs' payroll (stipulation 9), *$8,113.63* as rental for equipment used by plaintiffs (stipulations 10, 11 and 12), *$5,226.17* for fuel (stipulation 13) and *$971.36* for repairs to plaintiffs' equipment. In addition to these sums paid to and on behalf of plaintiffs, Miller & Long, as of June 1, 1952, had paid plaintiffs in accordance with partial pay estimates furnished by the Corps of Engineers the sum of $24,480.-32.

(7) By August 13, 1952, it had become apparent that plaintiffs were not getting the work done, and on or about that date, Miller & Long, with the knowledge and consent of plaintiffs, entered into a contract with W. R. Aldrich and Company to assist plaintiffs by starting at the West end of the contract job and do the borrow excavation East to Station 26,050. For this portion of the subcontract, Miller & Long agreed to pay W. R. Aldrich & Company One ($1.00) Dollar per cubic yard, based upon quantities measured and allowed by the Corps of Engineers. Subsequently, Aldrich was allowed a net yardage of 44,177 cubic yards, for which Miller & Long paid W. R. Aldrich & Company $44,177.

(8) The Plans and Specifications on the job called for ballast or sub-ballast (gravel and rock) to be placed in a trench cut in top of the embankment. The cutting of the trench turned out to be rather a costly operation. Crowder did 1,500 feet of it, which cost him approximately $1.00 per foot.

(9) On or about September 8, 1952, plaintiffs and Miller disagreed regarding whether or not the trenching called for by the plans and specifications was part of the work to be done by plaintiffs under the subcontract. Miller insisted that plaintiff and his associates had the duty to do the trenching under the contract, and Crowder refused to dig it unless he was paid the cost on it. There appears

in the record considerable testimony as to whether or not Miller actually ran them off, or whether Crowder and Associates simply left the job. Be this as it may, *there can be no question but that as of September 8, 1952, the subcontract was terminated, and this Court finds as a fact that it was terminated by mutual consent.*

(10) Miller & Long retained plaintiffs' equipment for a period of some fifteen (15) days and continued with the borrow excavation until an agreement was made with W. R. Aldrich and Company to complete the unfinished borrow excavation (except for the trenching) for a lump sum price of $42,000.

(11) After the entire contract had been completed, the Corps of Engineers cross-sectioned the right-of-way and found that 132,810 cubic yards of borrow excavation was involved in the entire job, and after deductions for non-pay items, such as strippings and road crossings, allowed a net total of 110,302 cubic yards, for which the general contractor was paid $126,847.30 (stipulation 22).

(12) Plaintiffs contend that Crowder and Associates completed 92,000 cubic yards of borrow excavation. They rely upon the testimony of their engineer, Earl E. Reynolds, whose deposition was taken by agreement in Houston, Texas, and which was filed in evidence as Exhibit P-20. Mr. Reynolds stated that he computed the dirt moved by Crowder and Associates as of approximately September 1, 1952. The testimony of Mr. Reynolds is to the effect that the dirt moved by Crowder and Associates was in excess of 92,000 cubic yards (Tr. pp. 20–21). Mr. Reynolds' estimate was based upon calculations made from field notes and cross-sections which were not introduced into evidence. Crowder testified under cross-examination that when he left the job the dirt work was seventy-five (75%) per cent complete (Tr. p. 121). Mr. Riddle, another partner of Mr. Crowder, testified that it was eighty (80%) per cent complete (Tr. pp. 210–211). A letter from Miller & Long to plaintiffs dated June 25, 1952 (stipula-

tion 8) states that 53,600 cubic yards of borrow excavation had been moved by plaintiffs prior to June 1st. However, the first ten partial pay estimates are in evidence (stipulation 23) and an examination of partial pay estimates will reveal an estimate of only 47,948 cubic yards of borrow excavation as of June 13, 1952. *Someone is obviously mistaken.* Defendants, in their brief, say that plaintiffs moved only 24,302 cubic yards up to the time the contract was abrogated on September 8, 1952. They begin with the assumption that the net yardage of borrow excavation was 110,302 cubic yards rather than 132,810 cubic yards, which was the total before deducting strippings and road crossings. They deduct from this 110,302 cubic feet the net sum of 44,177 cubic yards allowed W. R. Aldrich & Company for the section between Station 26,050 and the West end, plus *their estimate* of an additional sum of approximately 42,000 yards moved by W. R. Aldrich & Company for a lump sum price of $42,000, leaving a net total of approximately 24,302 cubic yards to be accredited to plaintiffs. The approximation of 42,000 yards moved by Aldrich & Company for the $42,000 has not been sustained and Mr. Brown testified that there was only approximately 10,000 yards of this additional work (Tr. p. 189). The Court finds as a fact that plaintiffs did 78,633 cubic yards of borrow excavation.

(13) Plaintiffs did 2,000 yards of channel excavation (stipulation 23), for which they were to be paid under the contract Thirty-Five (.35) Cents per cubic yard.

(14) Prior to September 8, 1952, plaintiffs did approximately 1,500 linear feet of trenching, at a cost to them of $1.00 per foot. There is and was a very serious dispute as to whether or not the trenching was part of the original subcontract between plaintiffs and Miller & Long, and whether or not Miller & Long had agreed to pay plaintiffs an additional sum for trenching. It is undisputed that work was terminated on the subcontract on or about September 8, 1952, after an

argument between Miller and a representative of plaintiff as to whether or not the trenching operation was a part of the subcontract. Mr. Miller took the position that it was a part of the contract and Mr. Riddle took the position that plaintiffs were entitled to extra compensation for trenching. We have already held that the contract was mutually abrogated on September 8th because of the inability of the parties to agree on who was to pay for trenching. It is apparent that there was never a meeting of the minds between plaintiffs and Miller & Long relative to the trenching. The contract between Miller & Long did not cover trenching one way or the other, and plaintiffs are to recover the $1,500 they expended on this work.

(15) Plaintiffs seek as damages the rental value of their equipment, which was retained by Miller & Long for a period of approximately fifteen (15) days after September 8, 1952. Miller & Long filed a suit in the State Court which was in the nature of an injunction proceeding against Crowder restraining and enjoining him from moving his own equipment off the job. The injunction was signed ex parte in the State Court and plaintiffs incurred attorneys' fees in the sum of $1,750 in regaining the use of said equipment and dissolving the injunction. Defendants do not deny that they retained plaintiffs' equipment, and they further concede that plaintiffs are entitled to a fair rental value for such equipment.

(16) Plaintiffs filed Exhibit P–24, which is a list of the equipment used by W. R. Miller, together with standard rates taken from Exhibit P–25, which was a book entitled *Rental Rates for Construction Equipment*. This particular book listed rental rates on equipment, and when compared with plaintiffs' Exhibit 24 shows a fair rental value of plaintiffs' equipment for two weeks to be $7,073. Defendants argue that one piece of the equipment was out of order, and that some of the equipment was in need of repair. However, the evidence does not disclose this with any particularity, and under proof plaintiffs are entitled to a rental value of $7,073.

(17) In addition to the actual rental value of plaintiffs' equipment, plaintiffs incurred $1,750 attorneys' fees in their successful suit to recover their equipment.

(18) Plaintiffs also seek recovery for the alleged extra cost of handling dirt by virtue of negligent engineering on the part of Miller & Long. The Court finds that the evidence introduced by plaintiffs fails to support the allegation that the general contractor was obligated to furnish plaintiffs engineering or that the engineering services performed by the general contractor were erroneous or negligently done, and for that reason plaintiffs' claim for $15,000 damages alleged to have been sustained by reason of faulty engineering must fail against both the surety company and the general contractor.

(19) There is likewise no merit to plaintiffs' claim for damage due to delay in starting the work. It is conceded that this delay was not occasioned in any way by the fault of Miller & Long, and it appears that the delay was in fact caused by the failure of the Government to acquire the necessary right-of-way (Tr. P. 48). Plaintiffs seek to recover because of an alleged oral agreement between themselves and Miller & Long, whereby Miller & Long supposedly agreed to give plaintiffs some undetermined part of any recovery from the Government because of such delay. Mr. Miller steadfastly denied the existence of such agreement. *The agreement has not been proven.* (See plaintiffs' testimony Tr. pp. 89–90).

(20) Plaintiffs' claim $2,500 damage alleged to have been caused by the fact that Miller & Long negligently erected fences along both sides of the right-of-way, thereby causing plaintiffs to move the dirt by an indirect route. A review of the plans and specifications will reveal that the general contractor was obligated to erect such fences, and that the plans and specifications showing this

were available to plaintiffs at the time their subcontract was executed. In addition, plaintiffs have failed to prove with any degree of legal certainty what damage, if any, they sustained by reason of the erection of such fences.

(21) The evidence does not support the claim that the work called for in change orders 2, 12 and 13 was actually performed by plaintiffs.

(22) Based on the Court's findings of fact, the following accounting is proper:

| Items Claimed by Plaintiffs | Total Claimed | Proven and Recoverable |
|---|---|---|
| (A) 92,000 cubic yards of borrow excavation and 3,192 yards of channel excavation | $ 59,717.20 | $47,938.05 [1] |
| (B) Trenching | 1,500.00 | 1,500.00 |
| (C) Equipment rental | 8,723.00 | 8,723.00 |
| (D) Negligent engineering | 15,000.00 | NONE |
| (E) Contract relative delay money | 16,000.00 | NONE |
| (F) Erection of fences | 2,500.00 | NONE |
| TOTAL | $103,440.20 | $58,161.05 |

Credits Due Defendants by Plaintiffs

| | | |
|---|---|---|
| 1. Payments made on estimates | | $24,480.30 |
| 2. Pay roll advances (stipulation 9) | | 17,300.31 |
| 3. Equipment rental (stipulation 10) | | 1,835.80 |
| 4. Equipment rental (stipulation 12) | | 4,500.00 |
| 5. Equipment rental (stipulation 11) | | 1,777.83 |
| 6. Equipment repairs (stipulation 14) | | 971.36 |
| 7. Fuel bills (stipulation 13) | | 5,226.17 |
| | TOTAL | $56,091.77 |

Balance of Accounts

| | |
|---|---|
| Amount due plaintiffs | $58,161.05 |
| Balance due defendants | 56,091.77 |
| Balance due plaintiffs by both defendants in solido | $ 2,069.28 |

| | |
|---|---|
| 1. Borrow Excavation | |
| 56,000 yards at 50¢ | $28,000.00 |
| 22,633 yards at 85¢ | 19,238.05 |
| 78,633 yards | $47,238.05 |
| Channel Excavation | |
| 2,000 yards at 35¢ | 700.00 |
| | $47,938.05 |

### The Law

(1) The District Courts of the United States have original jurisdiction of suits brought by a subcontractor against a general contractor and his surety for labor done and materials furnished on a government contract without the necessity for diversity of citizenship, Title 40 U.S.C.A. § 270b—The Miller Act.

(2) When a federal district court has jurisdiction of an original suit, it has jurisdiction of all germane ancillary proceedings. A counter-claim is treated as ancillary, and the Court will entertain the ancillary suit, although it could not have entertained it as an independent suit. Harris v. Travelers Insurance Co., D.C., 40 F.Supp. 154.

(3) Where jurisdiction is conferred by the Miller Act, and not by diversity, the rights and liabilities of the parties under the subcontract as to all issues not involving the interpretation or coverage of the Miller Act itself are governed by the law of the state where the action is brought. Continental Casualty Co. v. Schaefer, 9 Cir., 173 F.2d 5.

(4) On the issue of the surety's liability on the bond, the federal law governs because the determination of the extent of liability involves an interpretation of the Miller Act. Continental Casualty Co. v. Schaefer, supra.

(5) The Miller Act is to be liberally construed to effect its purpose and to protect those whose labor and materials go into and are used on public projects.

(6) The fair rental value of equipment is considered to be material for which a subcontractor can recover against a bonding company if such equipment is rented or used by the prime contractor. Susi Contracting Co. v. Zara Contracting Co., 2 Cir., 146 F.2d 606.

(7) Reasonable attorneys fees for dissolving a wrongfully obtained injunction is an item of damage which may be allowed. The controlling Louisiana law on whether or not damages can be recovered for the dissolution of the wrongfully obtained injunction is found in the cases of Albert Pick & Co. v. Stringer, 171 La. 131, 129 So. 731; Vidal v. Sterlington Gas Corp., 182 La. 19, 161 So. 6, 7; Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 183 La. 741, 164 So. 786; and Freeland v. Carmouche, 177 La. 395, 148 So. 658. But the question as to whether or not such attorneys fees can be collected under the Miller Act in this suit must be determined by the federal law. No authorities have been cited. However, this particular portion of the plaintiffs' claim is not based on negligence or on contract, and we think that under the Miller Act they are entitled to recover not only the fair rental value of the equipment, but also the expense to them of recouping it in cases where the recoupment is from the contractor and was made necessary by his action in retaining it. Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206—Court allowed expenses of getting equipment to and from job site.

(8) There is no necessity for passing here on the legal question as to whether or not the bonding company can be held under the Miller Act for the alleged breach of contract and the alleged acts of negligence on the part of the contractor. This is true because the Court has found as a fact that defendant did not breach the contract, and that the acts of negligence have not been proven. However, should this Court be in error in those findings it would still conclude that the action against Fidelity, being based solely upon the bond written pursuant to the Miller Act, is no broader than the provisions of the Act, and the surety company's liability would be limited to the claims based on work done and materials furnished as distinguished from claims based upon negligence and breach of contract. Coken, United States, for Use and Benefit of, v. Di Sandro, 88 F.Supp. 970; Lichter, United States, for Use and Benefit of, v. Henke Construction Co., D.C., 35 F.Supp. 388.

### The Zara Case

 Plaintiffs devoted a goodly portion of their brief to the Zara Case.[2] They rely entirely upon that case to support their claim that they are entitled to the alleged sum of $16,000 out of the sum awarded Miller & Long by the Government for delay in starting the contract. The Zara case is clearly distinguishable. In Zara, the subcontractor, as in this case, was the dirt contractor, but in performing his contract he found that erroneous representations had been made as to the character of the dirt involved, and that beneath the surface there was much clay. The contract drawings showed the character of the dirt to be silt. Despite this misrepresentation the subcontractor went ahead and excavated a considerable portion of the clay materials. The general contractor, because of the unforeseen character of the dirt and the erroneous representations, applied to the Government for extra compensation to remove the clay material. The Government allowed the general contractor's claim, but the general contractor refused to award any sum to the subcontractor for excavating the clay. The subcontractor in Zara had actually performed work on the subcontract for which he had not been paid. In the instant case, plaintiffs had not performed any work or furnished any material to the general contractor prior to December 13, 1951, and the claim by Miller & Long was filed on November 15, 1951. Moreover, the subcontractor in the Zara case was able to prove by competent evidence the exact cost of moving the clay, whereas in the instant case, plaintiffs have failed to show any evidence as to damages occasioned by the delay. *Plaintiffs in the*

Zara case established that the defendants breached or abandoned the contract. They then relied upon the accepted legal principle of contract law, often applied in construction contracts, that the promisee upon breach has the option to forego the contract and claim reasonable value. They were therefore able to recover on a quantum meruit claim. But in this case, the Court has already found that there was no breach of contract, and it must be noted that insofar as the claim for the $16,000 is concerned, and the claim for borrow excavation and channel excavation is concerned, this suit is on contract. Where plaintiff alleges on a contract, he cannot, as a general rule in Louisiana, prove a quantum meruit as to those items which he seeks to recover under the contract.[3]

The Zara case does not hold that a surety company is liable for breach of contract or torts of its principle, but holds only that a surety is liable for equipment rentals and work actually performed by the subcontractor on a quantum meruit basis when the general contractor breaches the contract. The claims in the instant suit for stripping and use of equipment are not based on contracts but on quantum meruit, and for those items this Court has allowed recovery.

### Conclusion

There should be judgment in favor of the plaintiffs and against the defendants, in solido, in the amount of $2,069.28.

The facts of this case were complicated. There has been no oral argument. The Court specifically reserves to each party the right to apply for a re-hearing within ten (10) days.

2. United States, for use of Susi Contracting Co. v. Zara Contracting Co., 2 Cir., 146 F.2d 606.

3. There are Louisiana cases involving the doctrine of unjust enrichment which hold that defendant may not lawfully enrich himself at a plaintiff's expense and should balance the burden of the costs of the work where he has reaped the benefit of it. This is not such a case. Here, defendants lost a tremendous sum of money on the subcontract as well as the contract.