UNITED STATES of America for the Use and Benefit of H. O. KILSBY, Appellant,

v.

John R. GEORGE and National Surety Corporation, Appellees.

No. 16311.

United States Court of Appeals Fifth Circuit.

March 29, 1957.

Rehearing Denied May 2, 1957.

---

Wm. Andress, Jr., Dallas, Tex., for appellant.

Allen Wight, Dallas, Tex., John D. Raffaelli, Texarkana, Tex., for appellees.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

A subcontractor, H. O. Kilsby, as use plaintiff, brought this suit under the Miller Act [1] against his prime contractor, John R. George, and George's surety. The record on appeal does not contain any transcript of the evidence because it is conceded that the facts were correctly found by the district court. The general factual background of the controversy is well stated by the learned district judge in his memorandum decision as follows:

"On or about August 10, 1954, the United States of America, acting through the Department of the Army, Corps of Engineers, Tulsa District, entered into a contract with George, d/b/a B & M Service Contractors, as prime contractor for the construction of certain additions to the water supply system at the Red River Arsenal in Bowie County, Texas, which contract bears No. DA–34–066–eng–4269 and will hereinafter be referred to as the prime contract.

"Among other matters covered by said prime contract was the construction of a clear well, i.e., a large underground concrete tank to be used for the purpose of removing undesirable ingredients in the water used in the water system at the Red River Arsenal. The clear well was to be 90 feet square and 11 feet deep and was to have a concrete top or roof on it.

"George was required to and did furnish a payment bond in the amount of $84,750.60 as required by the Miller Act with the Surety Company as surety thereon.

"On or about September 24, 1954, Kilby, d/b/a Trinity Engineer-Builders, entered into a contract with George under the terms of which Kilsby, as contractor, was to perform certain portions of the prime contract, including the construction of the clear well and the doing of certain other concrete work required in the prime contract, which contract between George and Kilsby will hereinafter be referred to as the subcontract. Under the

1. 40 U.S.C.A. §§ 270a–270e.

terms of the subcontract as originally entered into, Kilsby was to receive the sum of $52,867.60 for the labor and materials he was to perform and furnish under said contract, but by adjustments made in said contract the amount Kilsby was to receive thereunder was increased to the sum of $53,002.40.

"For some time prior to the date of the subcontract, Kilsby had been in the employ of George and Kilsby, as an employee of George, prepared the estimates that formed the basis of the bid submitted by George which resulted in George obtaining the prime contract. Under the terms of said contract, Kilsby agreed to supervise and act for the interest of George in the performance of the prime contract during the term of the subcontract for which service Kilsby was to be compensated in kind by George. In keeping with that provision of the subcontract, George, by letter dated September 20, 1954, advised the Corps of Engineers that he was authorizing Kilsby to act as his representative in all matters pertaining to the prime contract and for compensation for the services rendered by Kilsby as such representative George furnished Kilsby certain equipment, including trucks which Kilsby used in the performance of the subcontract. In other words, in so far as the prime contract was concerned Kilsby's relationship with George was a dual one, i.e., with reference to the work to be performed under the subcontract Kilsby was a subcontractor, but in dealing with the Corps of Engineers as to all matters pertaining to the prime contract Kilsby was the representative of George.

"The plans and specifications prepared by the Corps of Engineers for the projects that was the subject matter of the prime contract were made a part of the prime contract. General Provision 6 of the prime contract provided the manner and means by which any dispute concerning a question of fact arising under the contract must be decided.[2] Gen-

<hr>

"[2] '6. Disputes.—Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 30 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of this designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after the receipt thereof by the contractor he appeals in writing to the Secretary, which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary, his written decision or that of his designated representative or representatives, shall, unless determined by a Court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary may designate an individual, or individuals, other than the contracting officer, or a board as his authorized representative to determine appeals under this article. In connection with any appeal proceeding under this clause, the contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. Pending final decision of a dispute hereunder the contractor shall proceed diligently with the performance of the contract and in accordance with the contracting officer's decision.'

<hr>

eral Provision 4 of the Contract recognizes that the contractor will be entitled to additional compensation if he is required to perform added

labor or furnish additional materials because of subsurface or latent physical conditions at the job site differing materially from those indicated in the contract or because of unknown physical conditions at the job site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. This General Provision 4 further provides that if the parties cannot agree upon the adjustment to be made of a claim arising under the provisions of that condition the dispute between the parties shall be determined in the manner provided by General Provision 6. Under the terms of the subcontract in question the provisions of the prime contract, including the plans, specifications and general conditions or provisions, in so far as applicable to the work included in the subcontract, became a part of the subcontract.

"Kilsby's claim herein, in addition to his claim for reasonable attorney's fee, is composed of five items, namely, a claim in the amount of $450.23 for testing the clear well, which claim will hereinafter be referred to as the testing clear well claim; claim for $10,073.28 for water damage occasioned by the flooding of the clear well excavation, which claim will hereinafter be referred to as the water damage claim; claim for $2,006.-42 because of the underground obstructions not shown by the plans and specifications that were encountered in excavating for the clear well, which claim will hereinafter be referred to as the underground obstruction claim; claim for the sum of $2,754.40 for overlot grading included in the contract, which claim will hereinafter be referred to as the excess grading claim; and claim in the amount of $26,717.00 for additional expenses incurred because of a change in the time and manner of backfilling against the walls of the clear well, which claim will hereinafter be referred to as the backfilling claim.

"Each of the five items, referred to in the next preceding paragraph, was the subject matter of a claim made to the Corps of Engineers in keeping with the provisions of Condition 6 of the prime contract, above referred to. Since the prime contract specifically provided that there should be no contractual relationship between any subcontractor and the Government, the claims made to the Corps of Engineers were made in the name of B & M Service Contractors, the trade name under which George did business. Kilsby actually prepared each of the claims submitted to the Corps of Engineers and prepared them in the name of B & M Service Contractors. These claims were submitted to the Corps of Engineers with the approval of George and discussions were had by Kilsby and George with representatives of the Corps of Engineers from time to time as to said claims."

The water damage claim and the testing clear well claim have now been adjusted by agreement between Kilsby, George and the Government. The excess grading claim the district court found not to be justified because in fact no more grading was done than was included in Kilsby's subcontract. As has been stated, none of the district court's findings of fact is attacked. There is, thus, left for consideration only (1) the underground obstruction claim of $2,006.42, and (2) the backfilling claim of $26,717.-00. On those two claims the district court's findings of fact were as follows:

"Underground Obstruction Claim.

"In excavating the excavation for the clear well Kilsby encountered a few stumps and tree trunks buried underground at that location. In order for Kilsby to perform the excavation work required by the subcontract it was necessary that these stumps and tree trunks be removed

from the excavation and Kilsby in removing same from the excavation incurred expenses for labor and materials that he would not have had to incur in excavating for the clear well had said stumps and tree trunks not been buried underground at that location. Kilsby contends that in removing these stumps and tree trunks from the excavation he expended the sum of $2,006.42 for labor and materials that he would not have had to expend had he not encountered said stumps and tree trunks. Kilsby contends that the stumps and tree trunks were a subsurface or a latent physical condition differing materially from those indicated in the contract and that under General Provision 4 of the prime contract he was entitled to be compensated for the additional labor performed and materials furnished in connection with the removal of said stumps and tree trunks. Kilsby prepared an invoice showing that he expended the sum of $2,006.-42 in connection with the removal of said stumps and tree trunks and submitted same to the Corps of Engineers as a claim under General Condition 4 of the prime contract. This claim was submitted in the name of B & M Service Contractors by a letter dated August 10, 1955. By letter dated August 11, 1955, the Project Engineer requested George to furnish certain additional information with reference to this claim. Kilsby had knowledge of this request for additional information but to date has not furnished such additional information to either George or the Corps of Engineers. The Corps of Engineers has neither rejected nor approved this claim. Clearly, all of the excavation work for the clear well was included in the prime contract and under the subcontract between Kilsby and George was to be performed by Kilsby. There is no evidence of any agreement between George and Kilsby whereby George agreed to pay Kilsby any extra compensation because of the removal of the stumps and tree trunks by Kilsby. If the Government is to pay any sum as an extra for the removal of the stumps and tree trunks, the stumps and tree trunks must be determined to be either a subsurface or latent physical condition at the site of the excavation differing materially from those indicated in the prime contract or to be unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract as provided in General Provision 4 of the contract. That condition of the contract specifically provides that any dispute as to the matters covered by that condition of the contract must be determined as provided in General Provision 6 of the contract, above quoted. If it should be determined in the manner provided for by General Provision 6 that the removal of the stumps and tree trunks was an 'extra' within the meaning of General Provision 4 of the prime contract and that the Government should pay a sum over and above the contract price, the Government would be required to pay said sum so found to George and George, in turn, upon receiving said sum would be obligated to pay said sum to Kilsby. Unless and until the Government makes a favorable determination on the claim for 'extras' because of the removal of the stumps and tree trunks and pays the sum determined due therefor to George there would be no liability on the part of George to Kilsby because of extra expenditures made by Kilsby in the removal of the stumps and tree trunks from the clear well excavation."

"Backfilling Claim.

"As above pointed out, the prime contract did not require the testing

of the clear well. This claim is based on a contention by Kilsby that in the absence of the change order requiring the testing of the clear well he could have backfilled around the walls of the clear well as soon as the walls were completed and with the backfilling around the walls he could have constructed the roof or the top of the clear well and performed other work of the subcontract for a sum much less than he actually expended in the construction of the top of the clear well and in the performing of other work of the subcontract. In other words, Kilsby contends that because of the change order requiring the testing of the clear well he could not backfill around the walls of the clear well until the top of the clear well had been constructed and the clear well tested, and because of that fact it cost him much more money to construct the top of the clear well and perform other work under the subcontract than it would have cost him had he been able to backfill around the clear well walls before the top was put on the clear well. Kilsby, in May, 1955, prepared and submitted to George for submission to the Corps of Engineers his claim in the amount of $26,717.00 for excess costs growing out of the orders of the Corps of Engineers delaying the backfilling around the clear well until the completion of the test of the clear well. George submitted to the Corps of Engineers this claim as submitted by Kilsby. By letter dated July 30, 1955, addresses to B & M Service Contractors, the Corps of Engineers advised George with reference to Kilsby's said claim that the Corps of Engineers recognized that Kilsby was entitled to an equitable adjustment on the claim but that the formulas upon which Kilsby sought to negotiate an adjustment of the claim were rejected. In this letter the Corps of Engineers further advised, in effect, that they would negotiate on the claim on the basis of actual increased cost in-

curred because of the delay and for a reasonable allowance for overhead and that if such a basis for settlement was acceptable, a representative of the Corps of Engineers would meet with George for the purpose of negotiating. Kilsby was advised immediately of and shown this letter from the Corps of Engineers, but Kilsby took no further action in the matter and did not request George to take any further action. Consequently, no final decision as to this claim has been made by the Corps of Engineers.

"Unless the subcontract places liability on George to Kilsby for the claims of Kilsby herein made, there could be no liability on the part of George to Kilsby for said claims or any part thereof because there is no evidence that shows or tends to show that George ever either requested Kilsby to perform the work forming the basis of the claim herein made or that George ever agreed to pay Kilsby for said work.

"In view of the provision of the prime contract to the effect that there should be no contractual relation between the Government and any subcontractor, all claims for 'extras,' such as Kilsby's claim herein made, claimed by a subcontractor had to be made to the Corps of Engineers by and through George. That being true, George was under the duty to exercise due diligence in the presentation and prosecution of any claim for 'extras' made by Kilsby. As to each of the five claims involved herein and above discussed, I find that George exercised due diligence in the presentation and prosecution of said claim."

The district court has thus found that George never did, in fact, agree to pay Kilsby any extra compensation either for the underground obstruction claim or for the backfilling claim. The payment bond provided under the Miller Act is "for the protection of all persons supplying labor and material in the prosecution of the work provided for in said con-

tract." 40 U.S.C.A. § 270a (a) (2). The laborers under Kilsby have apparently been paid. No question has been raised but that the bond protects his materialmen. Of course, Kilsby himself "labored" on the job, and normally the subcontractor is protected to the extent of the labor and material supplied by him.[2] In the present case, however, there being no contract between George and Kilsby as to these two "extras," George is under no obligation to pay Kilsby for them, and Kilsby at best, under equitable principles of subrogation,[3] or otherwise, can require George to present and prosecute the claims under his prime contract with the Government, in which event the dispute of these two claims must be settled in the manner provided by General Provision 6 of the prime contract.[4]

■ The district court further found that under his subcontract Kilsby would have been entitled to receive payments from George in the aggregate sum of $61,646.31; George had paid to Kilsby and to materialmen for Kilsby's use and at his request a total of $58,769.96, leaving a balance of $2,876.65 that would normally be owed by George to Kilsby. Against this balance George was entitled to set off $1,375.61 expended by George to complete the unfinished work required of Kilsby under the subcontract. The district court further found that,

"there are unpaid outstanding bills for materials furnished by others to Kilsby for use by Kilsby in the performance of the subcontract in an aggregate sum in excess of $18,000, and that those who furnished said materials have made demands on the Defendants for the payment thereof. Of the bills just mentioned $6,-

116.59 of same represent charges for materials used by Kilsby in the performance of the subcontract that were charged to George's account by Kilsby. In view of the fact that George was compelled to expend the sum of $1,375.67 to complete Kilsby's subcontract and the fact that George, under the performance bond in question, is liable for most, if not all, of the unpaid bills for materials furnished Kilsby, as aforesaid, George has every right to withhold the payment of said sum of $2,876.65 to Kilsby at this time."

The judgment entered by the district court, that the plaintiff take nothing, further provided:

"This judgment is without prejudice to the right of the use-plaintiff Kilsby to demand and enforce payment of and from the defendant George of the sum of $2,876.65 due Kilsby under the subcontract, which is now in the hands of the said George and any and all sums which the Government may allow in the future and pay to the said George on the underground obstruction, the excess grading and the backfilling claims of the said use-plaintiff Kilsby, or any of them, above mentioned, provided said sums are not paid by the said George to persons who furnished materials and services to Kilsby for use by Kilsby in the performance of his subcontract and who have not been paid for such materials and services, and for which materials and services the said George is liable."

In our opinion that judgment was right, and it is

Affirmed.

2. Continental Casualty Co. v. Schaefer, 9 Cir., 173 F.2d 5, 9; United States for Use of Edward E. Morgan Co. v. Maryland Casualty Co., 5 Cir., 147 F.2d 423, 425; United States for Use and Benefit of Lichter v. Henke Construction Co., D.C.W.D.Mo., 35 F.Supp. 388, 389; United States ex rel. Crowder v. Fidelity

& Deposit Co. of Maryland, D.C.W.D. La., 144 F.Supp. 322, 329.

3. See 50 Am.Jur., Subrogation, § 8 and § 22.

4. United States v. Blair, 321 U.S. 730, 737, 64 S.Ct. 820, 88 L.Ed. 1039; United States for Benefit and on Behalf of Lanehart United Enterprises, 5 Cir., 226 F.2d 359, 363.