UNITED STATES of America, for the Use of J. A. POSTELL, Plaintiff,

v.

B. PERINI & SONS, a Massachusetts corporation, et al., Defendants (SAINT PAUL–MERCURY INDEMNITY COMPANY, Defendant to Counter-claim).

Civ. A. No. 304.

United States District Court
N. D. Florida,
Marianna Division.

March 20, 1958.

Robert M. Ervin, Tallahassee, Fla., for plaintiff and defendant to counter-claim.

Richard J. Gardner, Quincy, Fla., and Randolph W. Thrower, Atlanta, Ga., for defendants.

DE VANE, District Judge.

This is an action brought under the Miller Act, 40 U.S.C.A. § 270b, by J. A. Postell, a subcontractor, against several contracting companies joined together as the prime contractors for the construction of the Government lock and fixed crest spillway at the Jim Woodruff Dam project just below the confluence of the Chattahoochee and Flint Rivers near Chattahoochee, Florida. These two rivers are the headwaters for the Appalachicola River, which flows peacefully from their confluence to the Gulf of Mexico approximately 100 miles south.

Hereafter in this Memorandum-Decision, plaintiff will be referred to as Postell and defendants as Perini or the Perini group.

The prime contract between the Perini group and the Government was entered into on May 16, 1949. The contract and the specifications divided the work into 111 pay items and the total contract price was the sum of $8,714,972.70. Other pay items were subsequently added, but they are not pertinent to this litigation. The Postell sub-contract bears date of May 31, 1950, and called for a turnkey job for item 55 at an overall cost of $58,580. The awarding of this sub-contract to Postell brought on a battle royal between him, the Corps of Engineers and the Perini group, which will not end until this case is finally assigned to the closed cases in someone's filing cabinet.

In order to properly understand and appreciate the effect this controversy had upon this case, it is necessary for the Court to detail briefly the background that brought it about.

The Corps of Engineers desired to use a new type of hydraulic equipment to operate the lock gates at the dam, and after an investigation of various types of hydraulic equipment, those in charge of the preparation of the plans and specifications arrived at a preference for hydraulic equipment manufactured by the Vickers Company of Detroit, Michigan. Upon reaching that conclusion, the Corps of Engineers consulted with engineers of the Vickers Company in connection with the preparations of the plans and specifications for item 55, and included in the contract and the specifications a provision that Vickers Company or "similar and equal" equipment should be used in the hydraulic system. The Corps of Engineers in its specifications went one step further and provided that each power unit should "be factory assembled by the pump manufacturer and tested at his plant".

The Corps of Engineers was fully aware that it had no authority to specify the equipment of any particular manufacturer for this dam project, but the use of the language just quoted was put into the specifications as a red flag that the Corps of Engineers expected Vickers equipment to be used, as no other manufacturer in the United States was equipped to factory assemble and test the equipment at its plant.

Mr. George Putnam Collier, the Chief Engineer of the Mobile, Alabama, office of the U. S. Corps of Engineers and in charge of this project, forthrightly testified that the contract and specifications were so drawn as to insure that Vickers equipment would be used on this project.

The evidence in the case shows that there are a number of manufacturers of hydraulic equipment similar to that manufactured by the Vickers Company, and that one of these, Logansport Machine Company, Inc., of Logansport, Indiana, furnished prices to Perini for the hydraulic equipment called for under item 55 of the specifications prior to the time Perini filed with the United States its bid for the entire project, and shortly after the contract had been awarded to Perini, Postell wrote Perini, advising him that he was and for some years had been the representative of Logansport Machine Company in this area and requested an opportunity to be permitted to bid on item 55 when Perini was ready to send out invitations for bids on this item. Postell was subsequently given an opportunity to bid and his bid turned out to be the lowest of several bids received by Perini, and the sub-contract awarding item 55 to Postell was executed May 31, 1950. The contract provided that the work was to begin on item 55 not later than April 1, 1951, and to be completed on or before July 1, 1951.

The specifications required the submission of shop drawings of the entire hydraulic power unit to the contracting officer for approval before manufacture, assembly for test, or shipment. This provision meant that Mr. Collier of the Corps of Engineers, or persons under his supervision, had to approve the drawings before Postell and his suppliers could start the manufacture or assembly of the units for the project. Mr. Collier in no uncertain words, so Postell testified and this is not disputed, notified Postell that he would approve only Vickers units and he refused to approve shop drawings of Logansport units.

It was this attitude of Mr. Collier that started the chief controversy in this case. The evidence shows that Mr. Collier stood pat on his demand for Vickers equipment until after Postell took the controversy to Washington, secured the assistance of some members of Congress in his behalf, and finally on or about May 21, 1951, secured verbal assurance from Mr. Collier that he would consider shop drawings of other manufacturers than the Vickers Company, but it was not until October 23, 1951, that Collier specifically approved in writing the use of Logansport equipment. After that, drawings had to be submitted and approved, the equipment assembled and tested, and final approval given to its use before it could be shipped to the job. Final approval was not secured until December, 1951, and on some of it as late as April 7, 1952.

Postell had begun work as far as he could go after receiving Collier's letter under date of October 23, 1951, agreeing to the use of equipment other than that manufactured by Vickers, and he testified that he moved along as rapidly as he could, and after securing final approval of the last of the equipment on April 7, 1952, completed his contract by May 20, 1952, except for certain minor adjustments, which will be more fully referred to later.

This unpleasant controversy could have been avoided easily in the beginning had the parties thereto desired to do so in the public interest. Postell in one breath testified there was nothing unusual in the wording of the specifications calling for Vickers or "similar and equal" equipment, that this is frequently done to avoid unnecessary details in specifications, and then in the next breath he testified that the provision in the specifications that the power units should be "factory assembled by the pump manufacturer and tested at his plant", if strictly construed, eliminated all but Vickers power units, as no other manufacturer could meet this requirement.

Therefore, this Court, based upon all the evidence touching this phase of the controversy, is forced to the conclusion that Postell and his supplier, Logansport Machine Company, Inc., deliberately submitted the low bid for this project item with the full expectation of forcing the Corps of Engineers to accept other than Vickers equipment.

The evidence further shows that Perini assumed an air of righteous indigna-

tion towards Postell for the delay occasioned by the controversy over the use of equipment other than Vickers, which has not as yet subsided. The evidence also clearly shows that before the contract was awarded by Perini to Postell that Perini was fully aware of the fact that Postell was the agent and representative of the Logansport Machine Company, Inc., and expected to use equipment manufactured and sold by that company on this project and Perini was as fully aware as was Postell as to the plans and specifications indicating a desire on the part of the Corps of Engineers that Vickers equipment only be used on the job. Inquiry was made by the Court of a Perini witness as to the reason, under these circumstances, for awarding this contract to Postell and his only answer was that Postell was the lowest bidder of the group that submitted bids on item 55. He testified further there was nothing in the law, Perini's contract with the Government or in the specifications that required Perini to accept the Postell bid.

█ Based upon the testimony in the case, part of which is outlined above, this Court is also of the opinion that the Perini group is estopped to complain of the long delay occasioned by Postell's efforts to get Logansport equipment approved for use on the job. This estoppel becomes important when the Court considers Perini's counter-claim.

### Items Admitted and Contested in Postell's Claim

The parties are in agreement on the original contract sum of $58,580 and that Perini has paid Postell $57,044.42, thus leaving a balance due on the contract, without giving any consideration to Postell's claims for extras, the sum of $1,535.58

The following items claimed by Postell are admitted by Perini to have been approved by the Corps of Engineers and to be due and unpaid:

(1) Change Order No. 3 for operating valves with two way seals — $520.00
(2) Changing hydraulic oil to Shell Tellus No. 15 — 342.19
(3) Installing equalizer line — 939.10.

These sums added to the amount due under the contract total $3,336.87.

[2] Postell also claims that Perini is due him for extras and interest the sum of $11,651.09. The Court summarizes below the items making up this claim as follows:

(1) Installing remote control valves, labor and material — $ 1,093.51
(2) Retaining personnel on job account changes required by Corps of Engineers — 3,010.60
(3) Design changes in two Logansport Hydraulic Power Units as required by Corps of Engineers — 4,270.06
(4) Hydraulic Oil purchased by Logansport Machine Company in order to test power units with same oil used on job as required by Corps or Engineers — 185.95
(5) Dismantling and re-assembly of power units to permit installation since power house was completed before arrival of power units at site — 793.95
(6) Time and traveling expenses of field engineer to change setting of valves to keep lock gates from shifting — 273.92
(7) Labor and material for installing drain lines — 645.51
(8) Service call to Jim Woodruff Dam on 8/8/55 — 135.03
(9) Interest — 1,242.56

Total — $11,651.09.

The evidence in the case shows that plaintiff submitted most of these extras to Perini by invoice and that Numbers 1, 2, 5, 7 and 8 were passed on by Perini to the Corps of Engineers and disapproved. Upon receipt of disapproval, Perini promptly notified Postell and the evidence shows that Postell never made a demand in a single case that Perini take an appeal from the ruling of the Corps of Engineers with reference to the disallowance of these items.

As to item 3, under date of May 2, 1952, Postell forwarded to Perini Invoice No. 196603 covering this item. The Invoice was found by Perini to be inaccurate and incomplete, and it was returned to Postell for correction and for the required supporting data under Government regulations. The Invoice, according to the undisputed testimony, was never resubmitted by Postell.

Items Numbers 4 and 6 were not submitted to Perini by Postell for submission on to the Corps of Engineers, but merely constitute additional billing made by Postell against Perini, which was declined by Perini.

Postell contends that Perini is liable to him in full for all the foregoing items for extras and contends it makes no difference as to Perini's liability to him whether the Corps of Engineers approves the same or not. In support of this contention, plaintiff relies on United States, for Use of Gillioz v. John Kerns Construction Company, 8 Cir., 140 F.2d 792.

Perini in disputing liability relies upon United States, for Use and Benefit of Kilsby v. George, 5 Cir., 1957, 243 F.2d 83, and United States, for Use of Chamberlain Metal Weatherstrip Company v. Madsen Construction Company, 6 Cir., 1943, 139 F.2d 613.

Based upon the peculiar facts surrounding this controversy and litigation, the Court is of the opinion that none of the cases cited are necessarily controlling here, but that the law and justice of the case is with Perini on the claims for extras. Postell has been charged with notice that he was going to have a great amount of trouble with the Corps of Engineers in proving to them that his supplier, Logansport, could manufacture and install just as satisfactory equipment as could the Vickers Company. He won out in this battle, but he is certainly not entitled to recover from Perini the additional expenses he was put to in winning his point and getting his equipment accepted. This victory will have to suffice as compensation for the additional expenses incurred in winning his contest. The Logansport equipment has now been in operation for more than five years and there is nothing in this record to indicate that it has not operated perfectly since placed in operation.

■ As to the remaining claim for interest, the evidence shows that Perini was justifiably slow in making payments for work done under the contract for the reason that Postell was continually in the "dog house" with the Corps of Engineers and final approval for the use of many of the items of equipment used was not cleared with the Corps of Engineers until only a short time before the contract was substantially completed, and this situation justified Perini in being somewhat cautious in making payments to Postell.

Although Postell did not know it in advance, it developed after this suit was filed that Perini was waiting until an appropriate time to assert a substantial counter-claim against Postell, which he did assert along with his answer to the complaint filed by Postell in the case. This constituted another and second excusable delay on the part of Perini for not making payments more promptly.

■ It is the opinion of the Court that interest should be charged Perini on the total amount found due Postell from October 14, 1952, the date on which the Corps of Engineers accepted the entire job, and interest from that date at 6% will be allowed.

■ Postell has by an amendment to his complaint asserted additional claims

against Perini in the sum of $8,821.25. These claims are made up largely of telephone and telegraph costs, travel expenses on trips to Washington, Chattahoochee and Mobile, engineering time, administrative costs and attorney's fees. The largest item is for that of attorney's fees, and the next largest item is that for engineering time that Postell claims was consumed primarily in getting his plans and drawings approved for the equipment to be used on the job. The Court ruled at the pre-trial hearing that there was no merit in any of these claims and reaffirms that ruling here.

■ Postell in his amended complaint also attempted to assert a claim for punitive damages against Perini. The Court ruled at the pre-trial hearing that Postell failed to plead a valid case for punitive damages and allowed no testimony to be introduced on this issue. That ruling is reaffirmed here.

### Perini's Counter-Claim

Along with his answer to the complaint, Perini filed a counter-claim against Postell and his surety, Saint Paul-Mercury Indemnity Company. The claim is made up of four separate items as follows:

(1) Claim for use of equipment, labor and material costs, overhead and profits in connection with the operation (opening and closing) of the Miter and Lock Gate Machinery before the hydraulic equipment was installed — $14,089.05

(2) Attorney's fees and expenses allegedly incurred in securing performance by Postell of his contract — 1,709.00

(3) Cost of long distance telephone calls and travel expenses to Atlanta and Mobile in aiding Postell in the performance of his contract — 1,500.00

(4) Interest at 6% on loss of use of monies withheld by Corps of Engineers in final payment on Perini's contract with the U. S. Government from March 3, 1952, to November 17, 1952, allegedly through fault of Postell to complete his contract earlier. — 19,450.00.

■ The first item enumerated above was work done by Perini without any notice whatever to Postell or without any demand upon Postell to do the work himself. Perini, therefore, laid no predicate whatever for charging Postell with this expense. Moreover, the testimony of Postell is to the effect that what Perini actually did could have been done for much less by him had he been given an opportunity to do it. As no proper predicate was laid for this claim, the item is disallowed.

■ As to the attorney's fees, travel expenses and long distance telephone calls charged by Perini against Postell, these fall into the same classification as do like expenses charged by Postell against Perini, and they are, therefore, for like reasons disallowed.

■ Perini introduced considerable testimony in an effort to sustain its claim for interest on the money withheld by the Government to November 17, 1952. The Court has carefully considered all this testimony—that offered by Perini and that offered by Postell—and is of the firm opinion that the evidence failed to support Perini's claim for interest. What the Government might have done differently from what it did do in giving final approval of all work done under the prime contract is purely speculative, and in addition, the evidence clearly shows that Perini was in no better position to demand of the Govern-

ment the payment of the money withheld which was to be paid only upon completion of their contract with the Government than was Postell to demand payment from Perini of the balance due him. As a matter of fact, the evidence shows that more work remained to be done under the Perini contract than under the Postell contract up to the day Postell secured final approval on his job, which approval was required to entitle him to payment in full therefor.

A final judgment will be entered in this case in conformity with this Memorandum-Decision.